**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW WALTER LIDDIC, | CASE NO. 1:14-cv-02190-YK-GBC |
| Plaintiff, | (JUDGE KANE) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 5, 6, 7, 8 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Matthew Walter Liddic ("Plaintiff") for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act").

Plaintiff asserts disability as a result of obesity and rheumatoid arthritis ("RA"). Plaintiff alleged onset in January of 2011, when he stopped working, and the ALJ issued the decision in April of 2013. Plaintiff was thirty-one years old on the alleged onset date. From January of 2011 through June of 2012, Plaintiff complained of pain, swelling, and stiffness. A state agency medical expert ("ME")

reviewed the evidence through March of 2012 and opined Plaintiff was limited as a result of his impairments, but could perform a range of sedentary work. The ME concluded that the self-reported severity of subjective symptoms and objective medical evidence failed to support limitations that would preclude all work.

Plaintiff's testimony conflicts with the subsequent medical evidence. In June of 2012, Plaintiff began treating with a new medication, Orencia. His doctor opined that Plaintiff responded excellently. The medical records from July of 2012 through April of 2013 show that Plaintiff mentioned almost no subjective complaints, and specifically denied pain and swelling at every monthly visit after July of 2012. Plaintiff testified to the ALJ, however, that Orencia provided only temporary relief, and his pain and swelling symptoms returned in July of 2012. He claimed that Orencia caused frequent infections during this period, but the record shows he had only one infection in the six months prior to his hearing. The ALJ properly concluded that the disparity between the medical records and his later testimony rendered him less than fully credible.

Under the deferential substantial evidence standard of review, the Court must uphold reasonable ALJ findings. Here, a reasonable mind could find that the ME opinion and Plaintiff's denial of symptoms after June of 2012 were adequate to conclude that Plaintiff was not disabled during the relevant period. For the

foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On January 17, 2012, Plaintiff filed an application for DIB under the Act. (Tr. 112-13). On April 27, 2012, the Bureau of Disability Determination denied this application, (Tr. 82-97) and Plaintiff filed a request for a hearing on May 8, 2012. (Tr. 100-01). On April 5, 2013, an ALJ held hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 52-81). On April 23, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 11-27). On June 12, 2013, Plaintiff filed a request for review with the Appeals Council (Tr. 7-10), which the Appeals Council denied on September 18, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On November 11, 2014, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On January 15, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs 5, 6). On February 23, 2015, Plaintiff filed a brief in support of his appeal ("Pl. Brief"). (Doc.7). On March 26, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc.8). On April 8, 2015, Plaintiff filed a brief in reply

("Pl. Reply") (Doc. 9).  On June 29, 2015, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla" and "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. *See* 20 C.F.R. § 404.1520.   The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520,

416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

Specifically, the Act provides that:

An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A).

## V.    Relevant Facts in the Record

Plaintiff was born on March 19, 1979, and was thirty-one years old on his alleged onset date. (Tr. 23). He was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 23); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as an assistant manager of a convenience mart, customer service representative, carpet cleaner, customer service manager, shift leader, van driver, and delivery route driver. (Tr. 22-23). From 1998 to 2008, Plaintiff earned between $5,870.32 and $15,613.16 each year. (Tr. 126). Plaintiff earned $19,915.29 in 2009, $18,899.92 in 2010, and $1,594.89 in 2011. (Tr. 126). He asserts disability as a result of obesity and RA[1] with an onset of disability in January 2011.  (Tr. 23) He reported that he made changes to his work schedule as a result of his conditions in August of 2010, and alleged that he stopped working as a result of his conditions in January of 2011. (Tr. 132). His

---

1 Plaintiff treated for deep vein thrombosis during the relevant period, but it had "resolved" with no further episodes by September of 2011. (Tr. 291-94, 334, 493-95, 589).  Plaintiff also treated for anxiety. (Tr. 21, 430-31). However, the ALJ found that Plaintiff's mental impairments were non-severe, and Plaintiff does not raise any allegation of error with regard to his mental impairments on appeal. (Tr. 16); (Pl. Brief, Pl. Reply). Plaintiff mentions anxiety and deep vein thrombosis ("blood clots) only in passing in his appeal. (Pl. Brief at 1).

most recent job was as a customer service manager at a Wal-Mart. (Tr. 22, 123-24, 133).  At time he stopped working, he had four children, including an infant. (Tr. 56, 75, 112-13). He received unemployment benefits for thirteen months, through about February of 2012, when they ran out. (Tr. 59). In January of 2012, he applied for benefits under the Act. (Tr. 112-13). At the time of the hearing in April of 2013, he was residing with his wife and three children. (Tr. 56). He watched his three-year old child during the day while his wife worked as a math teacher. (Tr. 56, 75).

Prior to his alleged onset of disability, Plaintiff began treating with rheumatologist Dr. Shantanu Bishwal, M.D., for complaints of pain and swelling in his joints. (Tr. 313, 326). He exhibited decreased grip strength, tenderness, synovitis, and decreased range of motion, but continued working full-time. (Tr. 326). Dr. Bishwal diagnosed him with RA. (Tr. 328, 334, 350).  Plaintiff asserts that he was missing time at work due to RA (Tr. 132), but on  November 4, 2010, he was "90%" better. (Tr. 334). He reported only "minimal stiffness in hips and feet," pain at a one on a ten-point scale, fatigue at a one on a ten-point scale, and no other constitutional symptoms. (Tr. 334). Physical examination was normal, tender joint count was zero, and his swollen joint count was zero. (Tr. 335). He asserts that he stopped working in January of 2011 due to his impairments (Tr.

132),  but on January 31, 2011, Plaintiff reported that his left wrist was only "mildly painful after tapering down prednisone" and his "[p]ain and swelling in knees and ankles has resolved." (Tr. 347). He reported pain at a two on a ten-point scale, fatigue at a one on a ten-point scale, and no other constitutional symptoms. (Tr. 347). Physical examination was normal and his tender joint count and swollen joint count were zero. (Tr. 349).  The record contains no other treatment records for the first four months of Plaintiff's alleged disability. Doc. 6.

Plaintiff reported "several swollen and tender joints" in April of 2011, and he began taking Embrel. (Tr. 468). In May of 2011, he had "no problems or complaints" aside from weight gain (Tr. 276), and in June of 2011, Dr. Bishwal observed "excellent response" and that "pain and swelling in his knees and ankles [had] resolved." (Tr. 380).

In September of 2011, Plaintiff reported pain at a four on a ten-point scale and his fatigue at a five on a ten-point scale, but was feeling "better overall" and had no other constitutional symptoms. (Tr. 392). Plaintiff had two tender joints, no swollen joints, and normal gait. (Tr. 392). By September 30, 2011, Plaintiff had "no recent episodes of leg pain or swelling," stiffness "upon waking" in the morning that "resol[ved]…upon use or activity," no "pain, redness [or] swelling on the joints," normal balance, no headache, no sleep disorder, "[n]o weakness, [n]o

fatigue and [n]o fevers, sweats, or chills," and "[n]o history of frequent colds or sinusitis." (Tr. 291, 293). In November of 2011, Plaintiff reported joint pain but no change in gait or constitutional symptoms. (Tr. 444).

In December of 2011, his RA was "active" with pain at a four on a ten-point scale and fatigue at a five on a ten-point scale, no other constitutional symptoms and only fifteen minutes of morning stiffness. (Tr. 414-424, 468, 470-71). Examination indicated wrist tenderness, normal gait, and swollen joints. (Tr. 470). Embrel had "declin[ed] [in] efficacy" and he began taking Humira. (Tr. 471, 501).

On January 27, 2012, Plaintiff completed a function report in connection with his application for benefits. (Tr. 162). He reported problems lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, completing tasks, using his hands, and getting along with others. (Tr. 160). He reported no problems with attention. (Tr. 160-61). He indicated that he was "often irritable due to pain," causing problems getting along with others. (Tr. 160). He reported Humira caused headaches and fatigue. (Tr. 161). He explained that he could lift less than five pounds and could walk less than half-a-mile. (Tr. 160).  He reported that he could drive and ride in cars, could go out alone, and shopped in stores every two weeks for up two-and-a-half hours. (Tr. 158). He indicated that he could not write, button, tie shoes, fasten his felt, and needed help bathing and using the toilet. (Tr. 156). He

reported that he spent his day taking one daughter to pre-school, getting his two-year old breakfast, picking his daughter up from pre-school, "attempting homework," making lunch, and helping with dinner and bedtime. (Tr. 156).

On February 3, 2012, Plaintiff reported no constitutional symptoms, specifically "[n]o change in weight, no weakness, no fatigue and no fevers, sweats, or chills," to providers. (Tr. 494). He had "normal balance" and "no headaches." (Tr. 494). He had "no history of frequent colds or sinusitis." (Tr. 494). Plaintiff had normal gait and no edema in his extremities. (Tr. 495).

On March 19, 2012, state agency physician Dr. Louis Tedesco, M.D., reviewed Plaintiff's file and authored a medical opinion. (Tr. 88). He opined that Plaintiff could perform sedentary work, with no more than four hours of standing in an eight-hour work day, postural limitations, and no manipulative limitations. (Tr. 88).  He explained that Plaintiff was only partially credible based on his course of treatment and ability to drive. (Tr. 87). In his review of the records, he notes that Plaintiff reported morning stiffness, but denied pain, redness, swelling, weakness, fatigue, fevers, sweats, and chills. (Tr. 85). Dr. Tedesco noted that Plaintiff reported pain, at most, of only a four on a ten point scale and fatigue at five on a ten point scale, and denied other constitutional symptoms. (Tr. 85). He noted that Plaintiff's Function Report indicated that he could walk less than a half-mile, and

was completed by Plaintiff. (Tr. 85). He noted Plaintiff exhibited a normal gait and had zero swollen or tender joints on multiple examinations. (Tr. 85).

Plaintiff reported pain, swelling and fatigue, but no other constitutional symptoms, from March of 2012 to June of 2012. (Tr. 432, 501, 503-04, 517, 520-22). In June of 2012, he began taking intravenous infusions of a new medication, Orencia. (Tr. 530). On June 27, 2012, Plaintiff had his second injection of Orencia. (Tr. 545). Plaintiff reported that he was not "having any pain related to [his] visit." (Tr. 546). He had "no physical impairment…that place[d] [him] at increased risk of fall." (Tr. 546). He had an "infection or illness with fever" since his first Orencia injection, which he had treated with antibiotics. (Tr. 549). He reported that, over the past week, he had not had any fever, chills, sweats, nausea/vomiting, painful swelling in one joint, sore throat, earache, sinus drainage, cough, diarrhea, burning on urination, or lymph gland swelling. (Tr. 549).

On August 28, 2012, Plaintiff denied "fever/chills, rash, nausea/vomiting/diarrhea, chest pain, shortness of breath, or dysuria, headache, or paresthesias" to his primary care provider. (Tr. 565). He was "aware that he needs to lose weight and will work on it," his RA was "stable,"  physical examination was normal, and he felt that he could exercise, diet, and lose weight. (Tr. 565-66).

Page **12** of **37**

On October 3, 2012, Plaintiff followed-up with Dr. Bishwal. (Tr. 583). Dr. Bishwal observed that "[s]ince the last visit he has had an excellent response on… Orencia…He has significant improvement in pain swelling and stiffness in hands, wrists, knees and ankles. He has less than 15 minutes morning stiffness." (Tr. 583). Plaintiff reported pain and fatigue as a one on a ten point scale and "denie[d] fevers, weight loss…[and] weakness." (Tr. 583). Musculoskeletal examination indicated "no swollen or tender joints, no synovitis." (Tr. 585). Dr. Bishwal concluded his "RA [was] stable" and continued his medications. (Tr. 586).

At every monthly Orencia treatment after June of 2012, specifically July 11, 2012; August 8, 2012; September 6, 2012; October 3, 2012; October 31, 2012; November 28, 2012; December 27, 2012; January 24, 2013; and February 21, 2013; Plaintiff was not "having any pain related to [his] visit." (Tr. 552, 559, 578, 595, 599, 606, 613, 620, 635). He had "no physical impairment…that place[d] [him] at increased risk of fall." (Tr. 552, 559, 578, 595, 599, 606, 613, 620, 635). He reported having no "infection or illness with fever" since his last Orencia infusion at every visit, except for one infection in January of 2013. (Tr. 555, 562, 581, 595, 602, 609, 616, 623, 626, 628).  He reported at each visit that, over the past week, he had not had any fever, chills, sweats, nausea/vomiting, painful

swelling in one joint, sore throat, earache, sinus drainage, cough, diarrhea, burning

on urination, or gland swelling. (Tr. 555, 562, 581, 595, 602, 609, 616, 623).

On April 3, 2013, Dr. Bishwal authored a letter that states:

Matthew Liddic is being treated by the rheumatology department at
the Geisinger clinic. Due to active inflammatory symptoms including
pain, swelling and stiffness I have prescribed prednisone as well as
hydroxychloroquine (plaquenil) and also recommended we change
intra-venous Orencia once a month to subcutaneous Orencia once a
week.

(Tr. 642). The record contains no contemporaneous treatment notes. Doc. 6.

On April 5, 2013, Plaintiff appeared and testified at a hearing before an ALJ.

(Tr. 52). He testified that his pain, stiffness, and swelling improved after his first

two doses of Orencia in June of 2012, but returned thereafter with  morning

stiffness for two to three hours each morning and pain "every day"  in "all the

joints of [his] right hand, [his]  right elbow, [his]  right shoulder, [his]  right hip,

knee and ankle, [his]  left ankle and left knee and [his]  left hand." (Tr. 60, 68). He

testified that he could stand up to fifteen minutes and sit for up to thirty minutes.

(Tr. 64). He testified that his right extremities were worse than his left extremities.

(Tr. 66). He testified that his medications caused side effects of weight gain and

headaches. (Tr. 61). He testified that his pain made it difficult for him to

concentrate "at times." (Tr. 62-63).

He testified that he lived with his wife and three children, aged three, five, and thirteen. (Tr. 56). He testified that, aside from getting his five-year-old and thirteen-year-old on the bus, he was "either in [his] recliner or laying on the couch" during the day. (Tr. 61). He testified that he did not perform any household chores. (Tr. 61). He testified to difficulties with self-care. (Tr. 65). He testified that he "sometimes" drops things due to swelling in his thumb and fingers. (Tr. 64). He testified that, three or four days a month, he felt so ill and fatigued that he stays in his bedroom for the entire day. (Tr. 68). He testified that he could drive, but not a standard transmission. (Tr. 58). He testified that his cane was recommended, not prescribed, and that he could walk "half a football field" with the cane. (Tr. 63). He testified that they had a bathroom installed in their home downstairs because he had difficulty climbing steps. (Tr. 67). He testified that when he goes shopping, he rides in a cart. (Tr. 69). He testified that he was "sick all the time" and that he had been on antibiotics "four times" in the last six months. (Tr. 69). He testified that his handwriting was "nearly illegible." (Tr. 70). He testified that his in-laws and a friend helped with his daughter, and that he did not go out to social events. (Tr. 63, 66). He testified that he had traveled ninety minutes to his family's home for holidays, but had to lie down partway through his Easter meal. (Tr. 9, 72).

Plaintiff's wife also appeared and testified. (Tr. 73-76). She testified that he was more active prior to his impairments. (Tr. 73-74). She indicated that their three-year old child was "self-sufficient," so he did not have to pick her up, give her a bath, or play with her for extended periods. (Tr. 74-75). She testified that Plaintiff could not shower, shave, or make his bed by himself. (Tr. 75). She testified that there "wasn't a whole lot of significant change" since Plaintiff started Orencia, and he was unable to do chores for more than ten minutes. (Tr. 76).

The ALJ issued the decision on April 23, 2013. (Tr. 24). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 10, 2011, the alleged onset date. (Tr. 16). At step two, the ALJ found that Plaintiff's obesity and RA were medically determinable and severe. (Tr. 16). At step three, the ALJ found that Plaintiff did not meet or equal a Listing. (Tr. 18). The ALJ found that Plaintiff had the RFC to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) except he could lift and carry up to 10 pounds. The claimant could stand/walk for up to 4 hours but he could only walk short periods of up to 5 minutes at a time and must use a cane for ambulation. He could sit for up to 8 hours with only occasional stooping, balancing, kneeling, climbing but never on ladders, ropes or scaffolds and no crouching or crawling. The claimant could occasionally push/pull with the upper and lower extremities but could only occasionally perform fine manipulation with both upper extremities. The claimant must avoid concentrated exposure to temperature extremes of hot and cold, wetness, humidity, vibrations and hazards such as moving machinery and unprotected heights.

(Tr. 19). At step four, the ALJ found that Plaintiff could not perform past relevant work. (Tr. 22). At step five, the ALJ relied on VE testimony and found that Plaintiff could perform other work in the national economy. (Tr. 23). Accordingly, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 24).

## VI.   Plaintiff Allegations of Error

### a. Bias

Plaintiff asserts that the ALJ erred because she approves "18% of the cases which come before her," while the "office average" is 38% and the "national average" is 44%.  (Pl. Brief at 11). Bias by an ALJ may be grounds for a remand because "due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Schweiker v. McClure*, 456 U.S. 188, 195-96, 102 S. Ct. 1665, 1670, 72 L. Ed. 2d 1 (1982). The Court "start[s], however, from the presumption that the hearing officers…are unbiased. This presumption can be rebutted by a showing of… [a] specific reason for disqualification." *Id.* However, "the burden of establishing a disqualifying interest rests on the party making the assertion." *Id.*

Plaintiff has not identified any legal basis for the use of statistics to show bias in this context. In a similar context, statistics alone would be insufficient. *See Matter of Beverly Hills Bancorp*, 752 F.2d 1334, 1341 (9th Cir. 1984)

("Unfavorable rulings alone are legally insufficient to require recusal [of District Court Judges as a result of personal bias pursuant to 28 U.S.C. §455(b)(1)] even when the number of such unfavorable rulings is extraordinarily high on a statistical basis."). The Second Circuit explained in *In re Int'l Bus. Machines Corp.*, 618 F.2d 923 (2d Cir. 1980):

> A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest. As Mr. Justice Frankfurter noted in *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring), "A timid judge, like a biased judge, is intrinsically a lawless judge."

*Id.* at 929. This rationale also applies here. *See also Marconi v. Colvin*, No. 1:13-CV-02531-GBC, 2015 WL 1427795, at *8 (M.D. Pa. Mar. 27, 2015) ("[A]n ALJ having a low rate of claim approval, by itself, is an insufficient reason to warrant a remand") (citing *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir.2011); *Johnson v. Comm'r of Soc. Sec.*, No. 08–4901, 2009 WL 4666933, at *4 (D.N.J. Dec.3, 2009); *Doan v. Astrue*, No. 04CV2039 DMS (RBB), 2010 WL 1031591, at *14–15 (S.D.Cal. Mar.19, 2010) *aff'd in part, rev'd in part sub nom. Phuong Doan v. Astrue*, 464 F. App'x 643 (9th Cir.2011); *Smith v. Astrue*, No. H–07–2229, 2008 WL 4200694, at *5–6 (S.D.Tex. Sept.9, 2008)); *cf. Grant v. Comm'r, Soc. Sec. Admin.*, 111 F. Supp. 2d 556, 567 (M.D. Pa. 2000) (Finding bias where ALJ

"believed that it was too easy for claimants to obtain Social Security benefits… was often highly critical of different groups of claimants, such as those who had had automobile accidents, had filed personal injury claims, or had filed worker's compensation claims…labeled such claimants as 'no-goodniks' and he referred to them in that manner hundreds, if not thousands, of times…the instruction sheet to the decision writer from [the ALJ] might have 'no-goodnik' written across the top…certain characteristics put a claimant at risk of being classified as such… if the claimant were black, Hispanic, a poor white, a union member, obese, allegedly mentally impaired, a workmen's compensation claimant, a controlled substance addict, a Department of Welfare employee, or an accident victim.").

Even if using statistics, alone, was appropriate to show bias, Plaintiff would not be able to use these particular statistics. Plaintiff has not identified any fact or legal argument that would suggest a 43% approval is the proper rate at which to approve disability applications. (Pl. Brief). Some statistical variation is due to chance. Statistical differences do not speak for themselves. Statistical differences are only relevant if they are "significant." *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011) ("A study that is statistically significant has results that are unlikely to be the result of random error.... To test for significance, a researcher develops a 'null hypothesis'… The researcher then

calculates the probability of obtaining the observed data (or more extreme data) if the null hypothesis is true (called the *p*-value). Small *p*-values are evidence that the null hypothesis is incorrect. Finally, the researcher compares the *p*-value to a preselected value called the significance level. If the *p*-value is below the preselected value, the difference is deemed 'significant.'") (citing Federal Judicial Center, Reference Manual on Scientific Evidence 354 (2d ed. 2000)). Plaintiff provided no evidence that the difference between the ALJ's approval rate and the average approval rate was significant, rather than just due to chance. Thus, these percentages alone cannot show bias. *See Preble v. Astrue*, No. CIV.A. 3:10-1896, 2012 WL 527058, at *4 (M.D. Pa. Feb. 16, 2012) ("Although ALJ "had a higher denial rate than other ALJs," remand was inappropriate because Plaintiff failed to present "evidence that [the ALJ] was specifically biased against him"); *Smith v. Astrue*, No. CIV. A. H-07-2229, 2008 WL 4200694, at *5 (S.D. Tex. Sept. 9, 2008) ("[C]ourt will not set aside the ALJ's decision based on allegations of generalized bias where the record reflects no particular bias against the claimant and adequately supports the decision"). Plaintiff has failed to meet his burden to show a "specific reason for disqualification." *Schweiker v. McClure*, 456 U.S. at 195-96. The Court does not recommend remand on these grounds.

### b.  Credibility

Plaintiff asserts that the ALJ erred in assessing his credibility. (Pl. Brief at 16-17). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing  20 C.F.R. § 404.1529(c)). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

Here, the ALJ found that Plaintiff's subjective complaints were not fully credible based on: (1) inconsistent claims; (2) objective medical evidence; and (3) activities of daily living. (Tr. 21-22). For instance, the ALJ noted that Plaintiff reported that he had pain "every day" and "often" contracted infections, but had normal reports to providers since starting Orencia in June of 2012. (Tr. 20-21). The ALJ also wrote:

> The undersigned Administrative Law Judge has also considered the determinations of [Dr. Tedesco] pursuant to Social Security Ruling 96-6p and finds that [his] conclusions are consistent with the other substantial evidence of record, including evidence submitted after [the opinion] and the testimony at the hearing. Therefore, the undersigned finds [Dr. Tedesco's opinion is] persuasive in that the claimant retains the residual functional capacity to perform some type of work (Exhibit 1 A). The record shows that the claimant has been diagnosed with obesity, and had complaints of joint pain. However, the claimant's grip has remained 5/5, after he underwent the Orencia the remaining exam findings were within normal limits…
>
> The undersigned finds that the claimant retains the residual functional capacity to perform less than a full range of sedentary work activity. The above finding is consistent with the objective medical evidence of record including diagnostic testing and measurable findings on clinical examinations. It is also consistent with the claimant's activity level as indicated by his stated ability to drive, shop for groceries and care for his 3-year-old daughter. The objective medical evidence of record does not support a finding that the claimant is more severely limited than stated above.

(Tr. 22).

Plaintiff asserts that the ALJ erred in relying on Plaintiff's activities of daily living. (Pl. Brief at 16-17). However, Plaintiff does not acknowledge that the ALJ produced two other rationales for rejecting his credibility. (Pl. Brief at 16-17). If the other rationales provide substantial evidence, then the ALJ's alleged error in relying on his activities of daily living will be harmless. *See Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014) ("[W]hether the error is harmless depends on whether the other reasons cited by the ALJ in support of her credibility determination provide substantial evidence for her decision") (internal citations omitted).

The ALJ found that a lack of objective evidence rendered Plaintiff less than fully credible. (Tr. 22). This is a proper factor to be considered in the credibility assessment. *See* SSR 96-7p. A medical expert, Dr. Tedesco, evaluated the medical evidence, and concluded that it did not substantiate Plaintiff's claims. (Tr. 22). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); *see also* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) (state agency physicians are "highly qualified" and "experts" in social security

disability evaluation.). No other medical opinion exists in the record to contradict Dr. Tedesco's opinion. Doc. 6.

Plaintiff's briefs do not acknowledge Dr. Tedesco's opinion or provide any reason to conclude was unreliable. (Pl. Brief at 15, Pl. Reply at 4). A reasonable mind could accept Dr. Tedesco's opinion as adequate to conclude that the objective medical evidence failed to support Plaintiff's claims, and the Court declines to reweigh the medical evidence in the face of opinions produced by competent professionals. *See Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder") (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations" (internal citations omitted); *Seever v. Barnhart*, 188 F. App'x 747, 754 (10th Cir. 2006) ("We will not fault the ALJ for failing to interpret [claimant's] symptoms and test results differently than [a medical professional]") (internal citations omitted).

The ALJ also noted that Plaintiff testified to pain "every day" and "often" had infections, but that the record showed "after he underwent the Orencia the remaining exam findings were within normal limits." (Tr. 20, 22). This is an

accurate characterization of the record. Plaintiff testified in April of 2013 that he had pain "every day" in "all the joints of [his] right hand, [his] right elbow, [his] right shoulder, [his] right hip, knee and ankle, [his] left ankle and left knee and [his] left hand." (Tr. 60). He testified that his pain, swelling, and stiffness improved after the first two Orencia infusions in June of 2012, but returned thereafter. (Tr. 60, 68). He testified that he had been on antibiotics four times in the previous six months due to recurring infections from the immune suppressing Orencia. (Tr. 69).

However, essentially none of the medical records from July of 2012 to April of 2013 indicate pain, stiffness, or swelling. Plaintiff specifically denied having any pain or swelling at all over the previous week on July 11, 2012, August 8, 2012, September 6, 2012, October 31, 2012, November 28, 2012, December 27, 2012, and January 24, 2013. (Tr. 552, 555, 559, 562, 565-66, 578, 581, 599, 602, 606, 609, 613, 616, 620, 623). At Plaintiff's October 3, 2012 follow-up with Dr. Bishwal, he reported pain and fatigue, but indicated each were only a one on a ten point scale. (Tr. 583). Dr. Bishwal noted he had "an excellent response" and "significant improvement in pain swelling and stiffness in hands, wrists, knees and ankles" with "less than 15 minutes morning stiffness." (Tr. 583). His exhibited "no swollen or tender joints." (Tr. 585). The record for Plaintiff's after-hours visit for

respiratory symptoms on January 31, 2013 does not mention joint pain or swelling. (Tr. 626-28). On February 21, 2013, Plaintiff was "not having any pain related to [his] visit." (Tr. 635).  On April 3, 2013, Dr. Bishwal authored a letter that Plaintiff had "pain, swelling, and stiffness," but the transcript does not contain any contemporaneous treatment record or indicate the severity of his symptoms. (Tr. 642). Thus, Plaintiff's treatment record after beginning Orencia infusions in June of 2012 contradicts his testimony that his pain and swelling returned, and were disabling, after June of 2012.

Contrary to Plaintiff's testimony, the records show only one infection in the six months prior to his hearing. (Tr. 69). Plaintiff reported an infection on January 31, 2013. (Tr. 626). He was treated with an antibiotic, and his symptoms apparently resolved, as he did not follow-up with his primary care physician or report continued symptoms. (Tr. 626). Prior to January 31, 2013, Plaintiff specifically reported having no "infection or illness with fever" since his last Orencia infusion on January 24, 2013, December 27, 2012, November 28, 2012, October 31, 2012, October 3, 2012, September 6, 2012, August 8, 2012, and July 11, 2012. (Tr. 555, 562, 581, 595, 602, 609, 616, 623). At Plaintiff's primary care check-up with Dr. Tomczyk on August 28, 2012, he had no "fever/chills, rash, nausea/vomiting/diarrhea, chest pain, shortness of breath, or dysuria, headache, or

paresthesias," he was "alert, healthy, no distress, well nourished and well developed," and physical examination was normal. (Tr. 565-66). In February of 2012, he reported "no history of frequent colds or sinusitis." (Tr. 494). Thus, the ALJ properly concluded that Plaintiff's treatment record after beginning Orencia treatment was inconsistent with his testimony. *See* SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency"); *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Even if the ALJ erred in relying on Plaintiff's alleged activities of daily living,[2] the ALJ properly relied on the objective medical evidence and the contradiction between his testimony and the treatment record after June of 2012. A reasonable mind could accept this evidence as adequate to conclude that Plaintiff was not fully credible. *See Pierce v. Underwood,* 487 U.S. 552, 565 (1988). The

_____

[2] Activities of daily living may be used to discount credibility if they either demonstrate an ability to perform substantial gainful activity or are inconsistent with the claimant's alleged limitations. *See* SSR 96-7p. Sporadic and transitory activities of daily living do not demonstrate an ability to perform substantial gainful activity, but may contradict a claimant's alleged limitations. *Id.* Consequently, sporadic and transitory activities may be used to make an adverse credibility finding. *Id.*

Court finds no merit to this allegation of error and does not recommend remand on these grounds.

### c.  Listing 14.09

Plaintiff asserts that he meets the requirements of 20 C.F.R. Part 404, Subpart P, Appendix, §14.09 ("Listing 14.09"). Listing 14.09 establishes presumptive disability for some inflammatory diseases, like RA, when the claimant meets all of the specified criteria representing "a higher level of severity than the statutory standard." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

Plaintiff asserts that "where the record fairly raises a question as to whether the Claimant's impairment is equivalent to a listed impairment, a medical expert should be called to evaluate it." (Pl. Brief at 15). Dr. Tedesco specifically evaluated Listing 14.09, and opined that he did not meet all of its requirements. (Tr. 86-87). As discussed above, the ALJ relied on this opinion, and Plaintiff's briefs do not acknowledge this opinion or provide any reason to conclude it was unreliable. (Pl. Brief, Pl. Reply); *see also* Local Rule 83.40.4(b) (In Social Security appeals, "court will consider only those errors specifically identified in the briefs."). Dr. Tedesco considered medical equivalence. (Tr. 86-88, 92); Program Operations Manual System (POMS) DI 24515.013 ("The signature of a State agency medical or psychological consultant…ensures that consideration… has

been given to the question of medical equivalence.").

Plaintiff also asserts the ALJ's assessment was "conclusory" and "boilerplate." (Pl. Brief at 14-15).   However, an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). If the "decision, read as a whole, illustrates that the ALJ considered the appropriate factors" and "discusses the [pertinent] evidence," the ALJ's explanation suffices. *Id.*; *see also Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). In the context of a Listing, an ALJ may only need to discuss one factor for the explanation to suffice, because the claimant must meet all of the specified criteria to meet a Listing. *See* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3); *Benway v. Colvin*, 3:11-CV-02233, 2013 WL 3989149, at *15 (M.D. Pa. Aug. 2, 2013) ("a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment") (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)

Listing 14.09A requires a claimant demonstrate either an inability to ambulate or an inability to perform fine and gross movements effectively as a result of rheumatoid arthritis. *Id.* "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* § 1.00(B)(2)(b); *see also id.* § 14.00(C)(6)("Inability to ambulate effectively has the same meaning as in 1.00B2b."). "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. . . . [E]xamples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id.* § 1.00(B)(2)(c); *see also id.* § 14.00(C)(7)

("Inability to perform fine and gross movements effectively has the same meaning as in 1.00B2c.").

Plaintiff asserts that he needs to use a single cane, in unable to ride his bike or walk in the woods, and can walk up to 150 yards. (Pl. Brief at 12-13). The medical evidence did not contain substantial evidence of an inability to ambulate. His providers observed he exhibited a normal gait. (Tr. 314, 325, 336, 349, 369, 382, 394, 415, 445, 495, 503, 519, 584). Plaintiff had normal strength, sensation, tone, and reflexes (Tr. 21, 314, 325, 336, 349, 369, 382, 394, 415, 495, 503, 519, 584). Dr. Tedesco reviewed the medical evidence through March of 2012, and opined that he did not meet Listing 14.09. (Tr. 82-89). Plaintiff denied pain, swelling and fatigue from July of 2012 through the date of the ALJ decision. *Supra*. Thus, the only evidence of an inability to ambulate was Plaintiff's April 2013 testimony. *Supra*. As discussed above, the ALJ properly found that this testimony was not credible because it was contradicted by the treatment record. *Supra*. Consequently, Plaintiff failed to produce evidence sufficient to establish inability to ambulate. *See Morrison v. Comm'r of Soc. Sec.*, 355 F. App'x 599, 601 (3d Cir.2009) (Claimant did not exhibit inability to ambulate effectively where she had a negative straight leg-raising test, normal strength, normal range of motion, normal gait, no atrophy in her lower extremities and no restricted hip rotation).

Regardless, Plaintiff's allegations, even if credited, do not establish an inability to ambulate effectively. *Bullock v. Comm'r of Soc. Sec.*, 277 F. App'x 325, 328 (5th Cir.2007) (Claimant was able to walk with the help of a single cane, as opposed to a walker, two crutches or two canes, climb stairs with the use of a handrail and could walk two blocks at one time); *Jones v. Colvin*, No. 1:13-CV-02161-GBC, 2014 WL 4796491, at \*10 (M.D. Pa. Sept. 26, 2014) ("Plaintiff does not assert that she ever needs to use a walker, two crutches, or two canes, and needing to use a cane 'periodically' does not constitute an "inability" to ambulate without a cane. Similarly, being unable to live in second floor apartment does not indicate that Plaintiff would be unable to "climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* With regard to Plaintiff's "stiff pattern" and "difficulty with transitional movements," neither rise to the level of inability to ambulate contemplated by the regulations. Moreover, the treatment record indicates that, while Plaintiff had difficulty getting into and out of a chair during her appointment[s]"); *Lefevre v. Colvin*, No. 3:12-CV-00787-GBC, 2014 WL 4293983, at \*8 (M.D. Pa. Aug. 29, 2014); *McCleave v. Colvin*, No. 3:12-CV-01161-GBC, 2014 WL 4060030, at \*10 (M.D. Pa. Aug. 15, 2014) ("Plaintiff must show the inability to walk without two canes, not one. Given her testimony that she only uses one cane to ambulate, Plaintiff fails to meet her burden of showing an

inability to ambulate") (internal citation omitted); *Godfrey v. Astrue*, No. 10-565, 2011 WL 1831582, at *6 (W.D. Pa. May 12, 2011); *Demcyk v. Astrue*, No. 10-239, 2010 WL 4257599, at *7 (W.D. Pa. Oct. 21, 2010).

Similarly, the medical evidence fails to support any claim that Plaintiff was unable to perform fine or gross movements. Dr. Tedesco reviewed the medical evidence through March of 2012, and opined that he did not meet Listing 14.09. (Tr. 82-89). Plaintiff denied pain, swelling and fatigue from July of 2012 through the date of the ALJ decision. *Supra*. Thus, the only evidence of an inability to ambulate was Plaintiff's April 2013 testimony. *Supra*. As discussed above, the ALJ properly found that this testimony was not credible because it was contradicted by the treatment record. *Supra*. Consequently, Plaintiff failed to produce evidence sufficient to establish inability to perform fine or gross movements.

The ALJ also addressed the relevant factors for Listing 14.09D. Listing 14.09D requires at least two constitutional signs (severe fatigue, fever, malaise, or involuntary weight loss) and marked limitation in activities of daily living, social functioning, or concentration, persistence, and pace. *Id.* "Constitutional symptoms or signs, as used in these listings, means severe fatigue, fever, malaise, or involuntary weight loss. Severe fatigue means a frequent sense of exhaustion that

results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id.* §14.00(C).

Plaintiff asserts that he met the requirement to exhibit constitutional symptoms because he was "sore" and "plagued by fatigue." (Pl. Brief at 13). Again, the only evidence of Plaintiff's alleged constitutional symptoms was his subjective complaints, which the ALJ properly found were not fully credible because they were contradicted by the treatment record. *Supra.* In January of 2011, Plaintiff reported fatigue at a one on a ten-point scale and denied other constitutional symptoms. (Tr. 334). Plaintiff reported fatigue at a five on a ten point scale in September of 2011, but no other constitutional symptoms, and by September 30, 2011, had no fatigue or other constitutional symptoms. (Tr. 291, 293). Plaintiff had no constitutional symptoms in November of 2011. (Tr. 444). Plaintiff reported fatigue at a five on a ten point scale in December of 2011, but at his next treatment record in February of 2012, he had no fatigue and no other constitutional symptoms. (Tr. 494). Plaintiff reported fatigue, but no other constitutional symptoms, from March of 2012 to June of 2012. (Tr. 432, 501, 503-04, 517, 520-22).  After starting Orencia in June of 2012, Plaintiff rated his fatigue as a one on a ten point scale at most. (Tr. 583).

In sum, Plaintiff frequently denied fatigue, and reported fatigue at most at a five on a ten-point scale. *Supra.* As discussed above, he was not frequently ill, and denied pain after beginning Orencia in June of 2012. *Supra.* Even if he reported severe fatigue at every visit, one constitutional symptom is insufficient. *See* Listing 14.09D. Moreover, Listing 14.09D requires evidence of a marked limitation in activities of daily living, social functioning, or concentration, persistence and pace. *Id.* As discussed above, the only evidence that Plaintiff was impaired in these areas were his subjective complaints. *Supra.* The ALJ found that these complaints were not fully credible. *Supra.* Thus, Plaintiff failed to produce substantial evidence that he met Listing 14.09D. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)

Plaintiff asserts that the ALJ failed to properly evaluate his obesity. (Pl. Reply at 3). The ALJ is required to consider Plaintiff's obesity in evaluating these Listings. *See* 20 C.F.R. Part 404, Subpart P, Appendix, §1.00Q. The ALJ explicitly considered Plaintiff's obesity. (Tr. 16, 18).  Dr. Tedesco acknowledged Plaintiff's RA and obesity, evaluated the record through March of 2012, and found that Plaintiff did not meet Listing 14.09. (Tr. 82, 85). After Plaintiff began Orencia in June of 2012, he denied pain, swelling, and fatigue from any impairment, including rheumatoid arthritis and obesity. *Supra.* Consequently, the ALJ found that Plaintiff's claims of pain, swelling, and fatigue were not fully credible, regardless

of the impairment allegedly causing them. *Supra.* Thus, the Court is able to reasonably discern that the ALJ properly considered Plaintiff's obesity. *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013). The ALJ reasonably found that Plaintiff did not meet Listing 14.09. The Court does not recommend remand on this ground.

## VII.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.

Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by

substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within
fourteen (14) days after being served with a copy thereof. Such party
shall file with the clerk of court, and serve on the Magistrate Judge
and all parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to
which objection is made and the basis for such objections. The
briefing requirements set forth in Local Rule 72.2 shall apply. A
Judge shall make a de novo determination of those portions of the
report or specified proposed findings or recommendations to which
objection is made and may accept, reject, or modify, in whole or in
part, the findings or recommendations made by the magistrate judge.
The Judge, however, need conduct a new hearing only in his or her
discretion or where required by law, and may consider the record
developed before the magistrate judge, making his or her own
determination on the basis of that record. The Judge may also receive
further evidence, recall witnesses or recommit the matter to the
Magistrate Judge with instructions.


Dated: December 17, 2015                    _____s/Gerald B. Cohn_____
                                            GERALD B. COHN
                                            UNITED STATES MAGISTRATE JUDGE